| | | |
|---|---|---|
| STORTO ENTERPRISES, INC.<br>2113 Laurel Brook Road<br>Fallston, Maryland 21047 | * <br> * | IN THE <br><br> CIRCUIT COURT |
|     Plaintiff, | * | FOR |
| v. | * | BALTIMORE COUNTY |
| EXXONMOBIL OIL CORPORATION<br>3225 Gallows Road<br>Fairfax, Virginia 22037 | * <br><br> * | Case No.: |
| Serve On Resident Agent:<br>    CSC – Lawyers Incorporating<br>    Service Company<br>    7 Saint Paul Street, Suite 1660<br>    Baltimore, Maryland 21202 | * <br><br> * <br><br> * | |
| and | * | |
| EXXONMOBIL CORPORATION<br>1251 Avenue of the Americas<br>New York, New York 10020 | * <br><br> * | |
| Serve On Resident Agent:<br>    CSC – Lawyers Incorporating<br>    Service Company<br>    7 Saint Paul Street, Suite 1660<br>    Baltimore, Maryland 21202 | * <br><br> * <br><br> * | |
|     Defendants. | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**COMPLAINT AND DEMAND FOR A JURY TRIAL**

Plaintiff, Storto Enterprises, Inc., (hereinafter "Storto"), by its attorneys Robert J. Weltchek, Kristopher A. Mallahan, Nolan J. Weltchek, and Weltchek Mallahan & Weltchek, LLC, files this Complaint against Defendants, ExxonMobil Oil Corporation and ExxonMobil Corporation (hereinafter collectively referenced as "Exxon"). Plaintiff brings this lawsuit and alleges, upon information and belief, as follows:

**INTRODUCTION**

1.     This lawsuit arises from a discharge of more than 26,000 gallons of gasoline – the rough equivalent of two and one-half large tanker trucks worth of gasoline – from Exxon's underground storage tanks located at a service station owned by Exxon and operated by Storto.  The station was known as the Jacksonville Exxon station and was located at 14258 Jarrettsville Pike, Phoenix, Maryland   21131.  As a direct result of inoperable or defective line leak detection system equipment, the discharge accumulated at a rate of 700 gallons a day over the course of 37 days in January and February 2006.  Exxon deliberately allowed the station to remain operational despite actual knowledge for many years prior to January 2006 of the defective leak detection equipment.  Despite obligations to provide Storto with properly functioning line leak detection equipment, Exxon deliberately concealed from Storto the fact that the line leak detection equipment was defective and/or unreliable in detecting catastrophic leaks.

2.     Shortly after discovery of the massive gas leak, Exxon promised to "buy-out" Storto's franchise in exchange for Storto's confidentiality, cooperation with cleanup efforts, and vacation of the property.  In accordance with their agreement and in reliance on Exxon's promise, Storto removed all personal property from the Jacksonville Exxon station and, on March 1, 2006, Storto executed a Confidentiality Agreement.  On June 13, 2006, despite its agreement with Storto to the contrary, Exxon terminated Storto's franchise without any compensation.

## PARTIES, JURISDICTION, AND VENUE

3.      Plaintiff Storto is a Maryland corporation.  For more than 30 years, Storto operated a retail "Exxon" branded auto repair and motor fuel facility in Jacksonville, Maryland and for more than 20 years at 14258 Jarrettsville Pike, Phoenix, Maryland 21131 ("the Premises" or "the Jacksonville Exxon").

4.      Defendant, ExxonMobil Oil Corporation, is a New York corporation, and a wholly owned subsidiary of Defendant, ExxonMobil Corporation, the world's largest publicly traded integrated petroleum and natural gas company. Defendants are engaged in the international refining and marketing of motor fuel and petroleum products under the "Exxon" and "Mobil" brands.  In Maryland, Exxon markets motor fuel under its "Exxon" trademark in part through a franchise distribution system whereby Exxon leases retail motor fuel outlets to purportedly independent "Exxon" franchisees that are authorized to operate locations under the "Exxon" brand. These "Exxon" franchisees, of which Plaintiff was one, purchased "Exxon" branded motor fuel from Defendant for resale to the motoring public under the "Exxon" trademark. One of Exxon's branded motor fuel locations was the Premises involved in this action.

5.      Jurisdiction is proper in the Circuit Court for Baltimore County, State of Maryland. This Court has jurisdiction over the subject matter of this action pursuant to, *inter alia*, the provisions of Maryland Code, Courts and Judicial Proceedings Article, Sec. 1-501. This Court has personal jurisdiction over the Defendants pursuant to, *inter alia*, the provisions of Courts and Judicial Proceedings Article, Section 6-102 and 6-103.

6.      Venue is proper in this Court pursuant to, *inter alia*, the provisions of Maryland Code, Courts and Judicial Proceedings Article, Secs. 6-201 and 6-202.

## FACTS

### Fraudulent Concealment of the Defective Line Leak Detection Equipment

7.      The electronic line leak detector (LLD) is the most important safety device mandated by Federal and Maryland law for the safe operation of a gas station. It is the LLD that protects the environment, the station operator, and the residents adjoining a gas station. The LLD provides early detection of line leaks and is intended, if functioning properly, to prevent the very type of catastrophic leak that occurred at the Jacksonville Exxon station in January/February 2006.

8.      Unfortunately for Storto, the station franchisee, and for the residents of Jacksonville, Exxon viewed the LLD more as an impediment to selling gasoline than as an important safety device. When the LLD would signal an alarm, it would shut down the pumps, and, consequently, prevent Exxon from selling gasoline.

9.      Tens of thousands of catastrophic alarms (signaling leaks of 3 gallons per hour or greater) occurred at Exxon stations utilizing the EECO 3000 LLD system throughout the United States from the late 1990's through 2006. Virtually all of these alarms were treated as false alarms due to the propensity of the EECO 3000 to generate false alarms.

10.     Exxon had actual knowledge for many years prior to January 2006 of the unreliability and defectiveness of the EECO 3000, which would routinely trigger false catastrophic alarms. Moreover, Exxon had known for many years that EECO alarms were largely ignored and "troubleshot" by technicians. Finally, Exxon had known for many years

4

that the EECO could not detect leaks of .1 or .2 gallons per hour, in direct violation of Federal and Maryland law.

11.    Despite this actual knowledge and recognition that since as early as 1998, the EECO 3000 LLD was unreliable, unsafe, ignored, and defective, all in violation of Federal and Maryland law, Exxon made a deliberate and greed driven corporate decision not to replace the EECO 3000 due to budget constraints (during the same period that Exxon became the richest company in the world).

12.    Starting in the early 1990's, Exxon began installing the EECO 3000 systems at its service stations around the country in order to provide leak/release detection as required by Federal (40 CFR 280.44) and Maryland law (COMAR 26.10.04.01, 26.10.05.01, 26.10.05.02, and 26.10.05.04). These laws require/mandate that the stations owner/Exxon utilize a LLD that will, among other things, detect a release/leak of gasoline of at least 3 gallons per hour and be capable of providing a 95% detection rate with a probability of false alarms of less than 5%.

13.    If the LLD is operating properly, it would be impossible to have a 26,000 gallon leak to occur over a 37-day period. Unfortunately for Storto and the residents of Jacksonville, Maryland, the EECO 3000 had a false alarm rate of virtually 100% and a detection rate of virtually 0%, all in violation of the above-referenced Federal and Maryland laws and all known by Exxon for many years prior to January 2006. As already noted above, Exxon never disclosed to Storto that the EECO 3000 was unreliable and defective.

14.    The line leak detection system that Exxon had in place at the Jacksonville station at the time of the leak, and for years prior, was the same defective and

5

unreliable system that Exxon had in place in stations throughout the country and which they began replacing in 2001 with a much more reliable system, the Veeder Root TLS-350.

15.     Exxon itself refers to its line leak detection equipment as **"Critical Safety Devices."**

16.     For years prior to the Jacksonville leak, Exxon had actual knowledge, based on its overall experience with the EECO line leak detection system in its stations around the country, that this equipment had an extensive history of unreliability, defectiveness and false catastrophic leak alarms.  Unfortunately, none of this information was ever disclosed to Storto.

17.     Exxon also knew and recognized that the prevalence of false alarms rendered a valid leak alarm (even assuming the EECO system were capable of actually detecting a leak) worthless.  The EECO line leak detection system was so prone to false alarms that Exxon and its service contractors, e.g.. Alger Electric, Inc., assumed that a catastrophic leak alarm was anything but an actual leak.

18.     For years prior to the Jacksonville leak it was common knowledge within Exxon and among its contractors that there was a severe shortage of parts with which to repair and maintain EECO line leak detection systems in Exxon stations.   This shortage resulted in needed repairs and maintenance going undone or being delayed, and in repairs being done with rebuilt or used parts that were themselves defective.

19.     As a result, EECO systems throughout Exxon's stations were subject to breakdowns of such frequency that Exxon knew the equipment could not be relied on to consistently detect and signal the existence of a leak.

20.     The unavailability and defectiveness of EECO system parts, and the fact that the EECO system was subject to constant breakdowns, added to its uselessness as a credible means of leak detection (i.e., whenever a catastrophic leak alarm went off, it was considered by the persons responsible for monitoring and maintaining the system as nothing more than an indication that there was a mechanical malfunction and that what had to be done to address the alarm was to find what part or parts needed to be replaced this time.)

21.     Similarly, there were pervasive problems with EECO systems failing the monthly or annual compliance leak tests:  again a failed leak test was not viewed as evidence of a leak, it was viewed as an indication that there had to be some mechanical failure causing the test fail.  These monthly and annual compliance tests were mandated by both Federal law (40 CFR 280.44) and Maryland law (COMAR 26.10.05.02).

22.     Exxon left the defective EECO system in place at the Jacksonville station despite knowing (and failing to disclose to Storto) all of the above facts for at least five (5) years prior to January 2006.

23.     After the leak was reported to the authorities, Exxon did not want Storto, the MDE, or the residents to know that the leak detection equipment it had in place at the Jacksonville station was defective and that Exxon had known it was defective for many years, yet deliberately left it at the Jacksonville station due to "budget constraints."

24.     Exxon therefore commenced a series of efforts to cover up the fact that the line leak detection equipment it had in place in the Jacksonville station was defective and thus the nature of its responsibility for the length and severity of the leak in issue. Therefore, after the Jacksonville station was shut down, by order of the MDE, Exxon

engaged in a scheme to tamper with and alter the evidence of its wrongdoing. Exxon deliberately accessed and altered the computer setting attached to the Jacksonville station's EECO 3000 line leak detection equipment, all in an effort to fictitiously create false evidence that would unfairly implicate an innocent contractor, Alger Electric.

25.     Then, without notice to the EPA, the MDE, Storto or surrounding homeowners, Exxon had the Jacksonville line leak detection equipment boxed up and shipped away.   Prior to shipping the equipment, Exxon deliberately destroyed key component parts of the LLD by failing to preserve the piston, sleeve, o-ring/seal and other elastomer parts in a solvent to prevent rotting or deterioration.

26.     Exxon had the equipment shipped to OPW, the successor in interest to the manufacturer of the line leak detection equipment.  In other words, in connection with an incident in which the line leak detection equipment failed to consistently signal a catastrophic leak, Exxon had the equipment shipped to a company that clearly had potential exposure for any defects in that equipment.

27.     Exxon then hired an alleged "expert," who had a history of doing work for both Exxon and OPW, to write a report supporting a theory that the Jacksonville line leak detection equipment was in good working order and had failed to consistently signal a catastrophic leak only because it had been calibrated by the Alger technicians in such a way as to render it unable to detect the leak.  This report asserted these opinions based on the expert's alleged testing of the equipment.

28.     Exxon sought to hide the fact that the "expert" was not even the individual who had done the testing of the equipment; that in fact when the "expert" was present during the testing it was an OPW employee that conducted the tests; that all indications are

the "expert" had no expertise whatsoever in the equipment being tested; and that much of the testing and the results thereof – results which support the conclusion that the Jacksonville line leak detection equipment was not properly functional when tested - were completely omitted from the "expert's" report.

29.     The testing that was done by the OPW employee included the removal, substitution and replacement of numerous components of the line leak detection equipment, permanently altering it from its condition at the time that the leak was discovered. Thus, Plaintiff has been permanently and totally deprived of the ability to have its own experts test the equipment in issue in the condition it was at the time that the leak was first reported.

30.     Storto only learned of the facts contained in the preceding paragraphs 7 through 29, which concern the fraudulent concealment of the defective EECO line leak detection, upon receiving service of the First Amended Complaint in the Consolidated Action of Alban, *et al* v. ExxonMobil Corp., *et al* (Case no. 03C06010932) on May 13, 2008. Clearly, the facts pertaining to the defectiveness and unreliability of the EECO 3000 were concealed by Exxon from Storto even after the filing of the original Alban Complaint. It was only through the Alban plaintiffs' discovery requests in late-2007 and 2008 that the facts relevant to the EECO 3000 were discoverable by the Alban plaintiffs and then, ultimately, contained in the First Amended Complaint.

### Buy-Out Agreement

31.     For thirty-eight years prior to February 2006, Storto was a lessee/franchisee of Exxon pursuant to written agreements between them, the most recent of which was for the period November 1, 2004 through October 31, 2007.

32.     Following the discovery of a gasoline leak from the underground motor fuel storage system at the Premises on or about February 16, 2006, Exxon management personnel, including, but not limited to John Bednash, instructed Storto to close its business at the Premises.

33.     Shortly after discovery of the leak, Exxon management personnel, including but not limited to John Bednash, promised to "buy-out" Storto's interest in the Exxon business operated on the Premises.  In exchange, Storto promised to maintain Exxon's confidence with regard to the gas spill.  A Confidentiality Agreement was signed and executed on or about March 1, 2006.

34.     Also in furtherance of the buy-out agreement, Exxon required and received Storto's cooperation in connection with the press.  Exxon provided Storto two separate statements of approved language if the press inquired about the massive gas spill at the Premises.  Storto declined to speak on the record to the press and referred inquiries to a telephone number provided by Exxon.  Furthermore, Exxon specifically asked Storto to remove all personal property from the Premises and to remain on the Premises several weeks after February 21, 2006 to assist in granting access to the Premises.  Storto did as instructed by Exxon, all in reliance on Exxon's promise to buy-out Storto's interest.

35.     In direct reliance upon Exxon's representations, Storto hired and paid for an expert to value its business and presented it to Exxon, as previously agreed.  Arnold Heckman, a competent business broker, valued Storto at approximately $604,000.00.  In addition, Storto provided to Exxon an itemization of specific out-of-pocket expenses totaling nearly $140,000.00, of which Exxon had previously only paid approximately $23,000.00.

10

36.     As a dealer/franchisee of Exxon for decades, Storto justifiably placed trust and confidence in Exxon and its personnel, and such personnel accepted that placement of trust and confidence.  A duty existed under the relationship between Exxon and Storto, which required Exxon to deal fairly and honestly with Storto.

37.     Storto was in an inferior position to that of Exxon.  Exxon controlled the Premises and it was the only party with knowledge as to its intention for the Premises.

38.     Despite Exxon's representations and promises that it would buy-out Storto's interest in the station, Exxon notified Storto by a letter dated June 13, 2006 that it was terminating the franchise, and thereafter advised Storto that it would not pay Storto as promised.

**COUNT 1**
(Fraud – Line Leak Detection)

39.     Plaintiff re-alleges and incorporates by reference as if fully set forth herein the allegations contained in all preceding paragraphs of this Complaint.

40.     As the owner of a gasoline service station, and especially as an entity closely associated with previous substantial gas discharges in the same general area where the current discharge occurred, Exxon, which had been found liable for punitive damages in connection with those earlier gas discharges, had heightened duties both to ensure the safety and proper operation, maintenance and/or repair of the underground storage tanks, and to disclose to Plaintiff, the station franchisee, MDE, and the public in a timely manner any adverse facts or conditions relating to the spread of gasoline from the underground tanks and pipes.

11

41.     Defendants, in spite of these heightened duties, neither alerted Plaintiff, nor MDE, about its defective and/or unreliable line leak detection equipment at the Jacksonville Exxon.

42.     Exxon deliberately failed to disclose this information to Plaintiff because if it disclosed that the Jacksonville Exxon station was without reliable, credible leak detection equipment, Exxon would have been exposed to government fines, private litigation, and public outcry. Also, Exxon would have been forced to spend the money necessary to install reliable, credible leak detection equipment. Moreover, had Plaintiff been aware of the reckless and dangerous corporate decision made by Exxon to delay replacing the EECO 3000 due to "budget constraints," Plaintiff would have demanded that the EECO 3000 be immediately replaced and/or would have stopped selling gasoline until a properly functioning line leak detection system was installed.

43.     Exxon deliberately failed to disclose this information to Plaintiff with the intent that Plaintiff be deceived into believing that the underground storage and piping system was safe and reliable and Plaintiff reasonably relied upon Exxon's concealment, believing and trusting that it was safely operating the station and that in the event of a catastrophic leak, the line leak detector would shut down the pumps.

44.     Plaintiff was so deceived and relied upon, to its detriment, the reasonable assumption that because Defendants did not disclose any problems or concerns pertinent to the condition of the line leak detection equipment that (1) the station had properly functioning line leak detection equipment; and (2) there was no reason to be concerned that a catastrophic discharge of gasoline could occur since a properly functioning line leak detector would shut down the pumps and thereby avoid anything more than a very small

12

release of a few gallons of gasoline. Similarly, Plaintiff, between January 12, 2006, and February 17, 2006, to its further detriment, relied upon the reasonable assumption that the line leak detection equipment was reliable and functioning properly, and, therefore, never suspected that that the station was losing 26,000 gallons of gasoline. Had Plaintiff been aware of the true facts, *i.e.*, that the EECO 3000 was unreliable, defective and non-functioning, the Plaintiff would have demanded an immediate and thorough investigation of the inventory discrepancies and would have temporarily shut down the station until the source of the discrepancy could be ascertained. This would have avoided a massive release of gasoline in to the surrounding community and would have enabled the station to continue to operate (once the source of the release was identified and repaired).

45.    Exxon's intentional fraud and fraudulent concealment were the direct and proximate cause of injuries to Plaintiff causing both actual and present harm to Plaintiff's property and economic interests, including but not limited to Plaintiff's loss of business. Plaintiff is entitled to recover damages for such injuries and anticipated additional costs for its injuries.

46.    As a direct and proximate result of Defendant's conduct, Plaintiff suffered injuries and damages in an amount to be determined at the trial that are in excess of this Court's minimal jurisdictional limits.

WHEREFORE, Plaintiff prays for relief as follows:

(a)    Compensatory damages of One Million Dollars ($1,000,000.00);

(b)    Punitive damages of Ten Million Dollars ($10,000,000.00);

(c)    Prejudgment interest;

(d)    All costs and attorneys' fees recoverable by law; and

    (e)    Such other and further relief as the Court deems appropriate.

**COUNT II**

(Fraud – Buy-Out Agreement)

47.    Plaintiff re-alleges and incorporates by reference as if fully set forth herein the allegations contained in all preceding paragraphs of this Complaint.

48.    Exxon misrepresented their intention to buy-out Plaintiffs franchise in exchange for Plaintiff's confidentiality regarding the gas spill, cooperation with the clean-up efforts, and vacation of the Premises. Exxon's misrepresentation was either made with knowledge of its falsity or was made recklessly and in disregard for whether the statement was true or false. Exxon's promise to buy-out the Plaintiff's franchise agreement was made with no intention of performing.

49.    Exxon intended that Storto would rely on the promise to buy-out Storto's franchise agreement. Storto did rely on the promise, vacating the Premises on or about February 17, 2006, executing a Confidentiality Agreement on March 1, 2006, hiring an attorney, and obtaining a valuation of the business. Such reliance was justified, and Storto suffered damages as a direct and proximate result.

WHEREFORE, Plaintiff prays for relief as follows:

    (a)    Compensatory damages of One Million Dollars ($1,000,000.00);

    (b)    Punitive damages of Ten Million Dollars ($10,000,000.00);

    (c)    Prejudgment interest;

    (d)    All costs and attorneys' fees recoverable by law; and

    (e)    Such other and further relief as the Court deems appropriate.

**COUNT III**
(Negligent Misrepresentation)

50.     Plaintiff re-alleges and incorporates by reference as if fully set forth herein the allegations contained in all preceding paragraphs of this Complaint.

51.     Exxon made a misrepresentation as to their intent to buy-out Plaintiff's franchise agreement in exchange for Plaintiff's confidentiality regarding the gas spill, cooperation with the clean-up efforts, and vacation of the Premises. Exxon, owing a duty of care, was negligent in making this misrepresentation.

52.     Exxon knew that Plaintiff would rely on the misrepresentation of Exxon's intent to buy-out Plaintiff's franchise agreement, which if false, would cause injury to Plaintiff.

53.     Plaintiff did in fact rely on Exxon's misrepresentation, such reliance was justified, and as a direct and proximate result, Plaintiff was damaged.

WHEREFORE, Plaintiff prays for relief as follows:

(a)     Compensatory damages of One Million Dollars ($1,000,000.00);

(b)     Punitive damages of Ten Million Dollars ($10,000,000.00);

(c)     Prejudgment interest;

(d)     All costs and attorneys' fees recoverable by law; and

(e)     Such other and further relief as the Court deems appropriate.

**COUNT IV**
(Breach of Contract)

54.     Plaintiff re-alleges and incorporates by reference as if fully set forth herein the allegations contained in all preceding paragraphs of this Complaint.

55.     Exxon made a promise that it would buyout Plaintiff's franchise in exchange for Plaintiff's confidentiality regarding the gas spill, cooperation with the clean-up efforts, and vacation of the Premises and Plaintiff agreed, thus forming a contract.

56.     On or about February 17, 2006, Plaintiff vacated the Premises and Exxon took over physical control of the property.  Moreover, on March 1, 2006, Plaintiff executed a Confidentiality Agreement regarding the gas spill, fulfilling their end of the buy-out contract.

57.     Exxon breached the contract by failing to pay Plaintiff the value of the business as agreed.

58.     As a direct and proximate result of the breach, Plaintiff was damaged.

WHEREFORE, Plaintiff prays for relief as follows:

(a)     Compensatory damages of One Million Dollars ($1,000,000.00);

(b)     Punitive damages of Ten Million Dollars ($10,000,000.00);

(c)     Prejudgment interest;

(d)     All costs and attorneys' fees recoverable by law; and

(e)     Such other and further relief as the Court deems appropriate.

**COUNT V**
(Detrimental Reliance)

59.     Plaintiff re-alleges and incorporates by reference as if fully set forth herein the allegations contained in all preceding paragraphs of this Complaint.

60.     Exxon made a clear and definite promise that it would buy-out Plaintiff's franchise agreement in exchange for Plaintiff's confidentiality regarding the massive gas spill, cooperation with the clean-up efforts, and vacation of the Premises.

16

61.     Exxon reasonably expected its promise would induce Plaintiff's confidentiality and vacation of the Premises.

62.     On or about February 17, 2006, Plaintiff did vacate the Premises and Exxon took over physical control of the property.   On March 1, 2006, Plaintiff executed a Confidentiality Agreement.

63.     Plaintiff was damaged to its detriment by relying on Exxon's promise to buy-out the Plaintiff's franchise agreement. Such detriment can only be avoided by the enforcement of the promise.

WHEREFORE, Plaintiff prays for relief as follows:

(a)     Compensatory damages of One Million Dollars ($1,000,000.00);

(b)     Punitive damages of Ten Million Dollars ($10,000,000.00);

(c)     Prejudgment interest;

(d)     All costs and attorneys' fees recoverable by law; and

(e)     Such other and further relief as the Court deems appropriate.

ROBERT J. WELTCHEK
KRISTOPHER A. MALLAHAN
NOLAN J. WELTCHEK
WELTCHEK MALLAHAN & WELTCHEK
2330 West Joppa Road, Suite 203
Lutherville, Maryland 21093
410-825-5287

*Counsel for the Plaintiff*

## DEMAND FOR JURY TRIAL

Plaintiff requests that the claims in this case be tried before a jury.

ROBERT J. WELTCHEK